Good morning. May it please the court. My name is Eitan Kaslianich. I'm representing Evelyn Morales in this appeal. I'd like to start off by reminding the court of how long these cases can take to get here. Ms. Morales was 56 years old when she applied for disability benefits. She turned 64 later this month. Now, Morales has been, she's alleging disability due primarily to anxiety, depression, and psychosis. Her earnings record, another historical fact in this case, shows that she worked steadily for almost 37 years, mostly as an accounts payable clerk. I'd like to now focus on the errors that require reversal. Now, this case is a little bit unusual. I often am here where there's one issue that's a pretty clear error or maybe two. There are many issues here, each of which is such a significant error that each of which by itself would require a reversal of the ALJ's decision. The first error involves the ALJ's treatment or failure to discuss the medical records for Morales' treating physician and SIN. As I noted in my briefs, the ALJ doesn't even mention her by name, doesn't acknowledge that she was Morales' treating physician, does not discuss most of her medical records, does not discuss her clinical findings. Which go over a period of about three years. Why should he? Well, because an ALJ is... Well, I understand what you're going to say, but is there any place in here where Dr. Tassin provides any analysis of her ability to work? Now, an ALJ... Is there any? No, there is not. She does not give an opinion on... I mean, I'm having a tough time where the doctor doesn't say anything, doesn't do anything, doesn't give any opinion, and the ALJ says, Well, I understand Morales went to clinic, I understand Morales reviewed her medical records, or excuse me, the doctor reviewed her medical records, and the records support her impairment. That's about the best you can get out of somebody who doesn't ever give an opinion, isn't it? No, it's not. What else could you get? What you can get when you look at a doctor's clinical findings that support their opinion and that describe their clinical observations of the symptoms that the person is experiencing, that provides the key undergirding, the key support that is required for an ALJ to then evaluate the person's credibility. If you don't look at any of the treating physician's description of the person's clinical findings, then you can... Then, as happened here, the ALJ then points to her testimony and says, Well, her testimony is unsupported by medical evidence. Well, it was supported by the medical evidence that he failed to mention. Well, as I understand it, the reports are some of them. He didn't even... The doctor didn't even sign some. But the reports would support subjective complaints. That's about the best we're going to get. So I guess if we're going to get to her credibility, then those would come into existence or into play in what we have to do. But as far as anything else Dr. Sim did, he didn't do anything. We're just putting these records out. The ALJ looks at every one of them. And now he's going to turn and say she's incredible. Maybe when we get to credibility, we'll need to talk about that. Right. No, you make a valid point. It would have been helpful, it would have been useful if Dr. Tseng had stated an opinion, a clear opinion about functional limitations. She did not do this. But under Social Security regulations, an ALJ is required to base their decision on all of the evidence, not just the evidence where people state an opinion about functional limitations. They have to take into account clinical findings as well. But he did. He did. As I understand it, ER 29 indicated that he did take all the evidence of all these people into account. He didn't mention everything because things that didn't have any weight or were not backed up in any way were not specifically discussed except to say they relied on the subjective condition reported by your client. Okay. That's not true. It's not correct by the ALJ. Okay. Because, in fact, Dr. Tseng was not simply reporting what Morales was describing. Now, you have to understand, when you're dealing with an impairment such as auditory, that includes auditory hallucinations, no one can ever know what that person is hearing in their head. I understand that. So that's a reliance on her subjective statement. That much is. What does carry, I mean, that obviously carries some weight, but it goes back to the credibility that my colleague referred to. But on other things, there are certain things that physicians can actually objectively test. And as I understand this, correct me if I'm wrong, in this case, none of these treating people or none of the doctors involved showed with objective, competent medical evidence that what your client was reporting was borne out by objective evidence. Did I miss something? Yes, you did. Okay, tell me what I missed. What you're missing are the signs that are reported in Dr. Tseng's reports, in Dr. Joseph's report, and in all of the mental health treatment notes from her mental health provider, none of which were discussed by the ALJ, and which I summarized in quite a way. Can you say the signs? The signs. Under Social Security regulations, signs are described as something that is clinically observable. That she sobbed. In other words, if you're sitting down with your patient and the patient is in tears, you can write down they weren't tearful. If you're sitting down with your patient and their affect is dysphoric or whatever, there's all of those signs that were reported. But the signs, do they not go back to the credibility of your client to start with? No, they do not. Oh, come on. You're telling me that if somebody is, I'm not saying this is your client. Let's just argue under her. Let's just say she's a really good actress, and she can go into the doctor, and she can just sob her eyes out, do all the things that would be indicative of something, and yet when she's talking to the ALJ, she talks about all of her acting training and how she specializes in fooling doctors. And the ALJ says, you know, I don't believe any of this, any of it. You're telling me that the signs that were manifested in my hypothetical to the doctor have some evidentiary value independent of what my hypothetical claimant said to the ALJ about what a great actor she is and how she fooled all these doctors? Well, let me start by saying you're correct that that is not his case. No, I didn't say it was his case. I said it was hypothetical. And you're also correct, I do not, I think that a person could feign signs, but a trained psychiatrist or mental health professional or psychologist would report it as such. In other words, there would have to be some inconsistency somewhere in this file. Someone would have seen, oh, well, for example, she says she's having all these problems, and then she walks out of the room, and she's laughing. You know, there would be some evidence. She talked about her affairs fairly routinely, didn't she? Well, her affairs largely consisted of staying home, staying in a dark room, having great difficulty even leaving the house. So, you know, she wasn't completely dysfunctional. When she started getting mental health therapy, they encouraged her to get out of the house, and it's reported there were times she was able to leave the house once a week, three times a week, other times she didn't leave at all. Let me quickly jump to the other, what I think is a very significant issue here, which involves the ALJ's misidentification of the medical report from Dr. Joseph. Dr. Joseph co-signed two letters. He was the supervising psychologist at the mental health clinic where Morales was getting her treatment. And the ALJ erroneously identified both of those letters as being from a mental health therapist, not a psychologist. And that's a very significant issue in Social Security adjudication, because the weight that is accorded to medical evidence, as you know, there's a higher weight accorded to the opinion of an acceptable medical source such as Dr. Joseph. But that isn't the only reason he rejected the opinion. That was one of the reasons. There was an alternative. The alternative was that he noted that the GAF score dropped between two letters from 60 to 45, yet the symptoms remained effectively the same. Thus, he rejected the letters because the record didn't support why the GAF score dropped. Now, that's the alternative basis. So let's get past this thing that he made a mistake about whether this was a student at the wellness project or the doctor. The alternative basis is true. The GAF score did drop between the two letters. And he says the symptoms were the same. So I'm rejecting. Okay. The problem with that reason is that the ALJ did not mention, did not discuss a single treatment note from the wellness center, all of the treatment notes which showed, which discussed her symptoms. Now, once again, symptoms are something you're telling the therapist. But they also discussed clinical observations, signs. Their observations of her affect and her observations of her tearfulness and the other, and their observation, their reporting of, you know, not the difficulty she was having leaving the house, but all, and her description, her detailed description of the auditory hallucinations that were so disturbing to her. But, again, we are, again, talking about subjective complaints by her to that center. And, again, this all relates, again, this case is a little different than most cases. Because in these particular situations, the ALJ went through the medical records, and he had already determined he didn't believe what she said at all. So he rejected subjective complaints by her because he thought she wasn't credible, even reviewing the records. So I understand what you're saying, but I think, again, you're getting, again, over on the credibility analysis, rather than you're really talking about, well, why should he be able to reject this or not. Well, once again, an ALJ has to base his decision on all the evidence. And you can't point to me where in his decision he discusses any of the evidence from the Wellness Center. Because he doesn't discuss, other than those letters, he doesn't discuss any of the treatment notes that detail, once again, not just symptoms, not just her reported auditory hallucinations, but also detailed their clinical observations, their signs. He doesn't discuss any of those. And if you don't take those into account, that's the evidence, that's the missing key evidence here that undermines the ALJ's reason for rejecting Dr. Joseph's opinion. Question for you. Admittedly, the ALJ must consider these things. Does he or she have to specifically mention all of them under the regulations, or simply say, I have reviewed the medical evidence presented here, the letters, et cetera, et cetera, et cetera, and I don't believe any of it, because it's based on subjective complaint. Is that sufficient? No, it is not. It is not. And what's the regulation that you cite? He has to discuss. He has to explain. I understand that. He has to explain. My question is, not whether he has to explain, but whether he has to refer specifically to individual letters or reports from these treating people. Yes, he does. And what's the regulation? Well, there's the case law. The law is not a case law, but it's the regulation. Give me a case law, whatever. Okay. I'd like to address that on rebuttal. Okay, that's fine. Thank you. Do you want to save some time? I would like to. Okay. Why don't you do that, and then give the government a chance here. Your Honors, Counsel, may it please the Court. My name is Lisa Lodatis, and I represent the Commissioner of Social Security. As Counsel has discussed, the ALJ is required to consider the evidence, but I'd like to distinguish consider versus addressing each piece of evidence by name or with exact particularity. The ALJ clearly did consider the evidence from the New Heights Clinic, as well as the evidence from the Wellness Center. At times, the ALJ referred to certain medical sources. At other times, the ALJ referred to the exhibits by number. But the ALJ did consider this evidence, and there is no case law or regulation that I'm aware of that says that an ALJ has to give the name of every physician. In fact, if we were to have an ALJ discuss every piece, the ALJ decision would be the same length as a transcript. What in the record would you refer us to that would confirm your position that the ALJ here examined all of the medical evidence? The ALJ specifies once or twice, and I'd be happy to look at it. Page 28, the ALJ says, after careful consideration of the entire record. The ALJ then goes through it, including discussing the New Heights Clinic. I did see stuff about the New Heights Clinic. Where do I see the reports or the underlying stuff from the wellness project? The wellness project, I believe, is exhibits 15. Are they the letters? The letters are discussed with particularity, but the exhibits themselves are also referenced in those. Excuse me, let me just check my notes. I believe those are 15 and 16, F, and those are both referenced. I wrote down, there's no question. He acknowledges she went to clinic and that he reviewed her medical records from the clinic and says the record supports her impairment claims, and he goes through that. But I'll have to look at 15, 16. The other evidence that has not been discussed yet is the consultative examinations. And these, there were two. One was in 2005. That was Dr. Isink, and he raised some concerns about the psychotic, her claims of psychosis. He did mention that he was concerned about whether it was possible malingering or a psychotic disorder not otherwise specified. So he flagged it, and he said she didn't appear to have negative symptoms of psychosis. And this was, I believe, on 2-21 and 2-25. She was very organized in her thoughts. My understanding that what he did was he really gave Dr. Alvord's opinion significant weight because it was the most current and based on a longitudinal record. That's correct. You mean he being the ALJ? ALJ. That is correct. But he gave Essek and Clifford and Ether, they were the state people, if you will, only moderate weight, and it seems to me that he gave them moderate weight because they didn't review all the medical evidence, correct? I am not exactly clear why he gave them moderate weight. It seemed to me that it was because they found that she was capable of doing more things, having fewer limitations than he actually determined. His residual functional capacity assessment was more limited. It was simple, repetitive. It was limiting her contact to the public and coworkers, whereas they seemed to feel that she could do detailed work, and he didn't think so. And that seems to be more why it was moderate. Dr. Alvord, I'm glad you mentioned him, is the only one who did extensive testing. And he, after doing all the testing, he also was concerned and didn't think that she presented as being psychotic. Well, the reason I worried about that was it seemed to me that all these doctors, Essek, Clifford, Ether, Alvord, that they all have substantially the same RFC recommendation. And based on those recommendations, then he determined that she had mild restrictions on daily living, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. And for that reason, he rejected the treating doctors. Well, those are in analyzing whether she meets the listing. They're not actually the residual functional capacity. Those are different. So in determining, because if she met a listing, it would be a, per se, finding a disability. So it is, I understand the terms are very similar, but it's actually a different analysis. This is a Step 5 analysis or something else? The RS, the residual functional capacity. No, no, no, not that. But you were saying the listing. The listing at Step 3. Right, so at Step 3. And if she had been found to meet a listing at Step 3, which is not at issue here in this case, it would have stopped and he wouldn't have gone on to Steps 4 or 5. Okay. But I do understand that concern because going through each of those criteria, it sounds very similar to the RFC, which is the most that she can do considering all of her limitations. Okay. In terms of the record, she also was getting treatment, and there are many, many references to working with medications, improvement with medication, then having additional difficulties with hallucinations, changing the medications. And in 2008, there was significant improvement with the combination of medications that she was then using. So Dr. Albert, of course, did have more of a perspective, a longitudinal perspective, and the ALJ could look at all of it, including her credibility. So all of the factors that he took into account are very well supported by the record. I would like you to turn to the credibility analysis. He finds Morales not credible, the ALJ. He finds that her statements concerning intensity, persistence, and limiting effects of the symptoms are not credible to the extent they're inconsistent with the above RFC assessment. I guess what is the standard that I have to meet to determine if I can agree with the ALJ on credibility? What's my standard of review? Well, the standard is substantial evidence. I understand substantial evidence, but what else do I need for credibility? In the Ninth Circuit, they have to be clear, cogent reasons. They have to be supported by the record, and, in fact, they were. For example, she claims she has had hallucinations for 20 years, but the ALJ said, despite that, she worked until she moved for reasons unrelated to her impairments. It was because of her husband's impairments. He was disabled. She was caring for him. The ALJ said that the level of activity she was engaging in was not consistent with her claims of complete inability to work, and he does. What about her husband's testimony? He only gave her husband's testimony moderate weight. What do I have to look at on a standard of review for that? With her husband, he needs to give a germane reason, and you can look at Valentine or there's many cases address that. And the germane reason was the same reasons, and he points out that Ms. Morales was somewhat exaggerated her symptoms. This is on ER-33. I get the feeling what he said was, overall, it was consistent but exaggerated. You'd agree with that? Yes. He also didn't say that she had declined since moving to Washington, and before moving to Washington she did have a long history of working, although she did have she claimed that she had hallucinations going back for 20 years. He also tried to point out why she had depression. He was sort of talking more as a medical, giving medical opinions, and the ALJ took some issue with that and said that he didn't have the expertise to decide whether there were therapeutic benefits of doing household chores, for example, or why she might be depressed. I'll be fair. One of the closest issues in this case for me is whether the ALJ gave clear and convincing reasons for rejecting her testimony. It seemed to me this was a close call because her statements were not necessarily inconsistent with her daily activities, and that's the thing that worried me the most. Would you like to comment about that? Well, I would. When she moved, so she had been working until then, and then she had some conflicts at work and moved and then didn't resume working, so went through this upheaval of moving. But there's no evidence that there was a decline. There's no explanation. The fact that somebody doesn't work doesn't mean necessarily that they're unable to. It means that they're not. So she's watching television, she's caring for her husband. No, she's not leaving the house, but she is in a new environment. And so there's no, given that there isn't that decline, there's not really an explanation for why she isn't working now. The psychologist who evaluated her also are not finding that she can't work. So it is a question, but the ALJ is required to have a rational and reasonable interpretation of the evidence, and here it is. It might not be the one that any of you judges would have, but it is a reasonable one. And because of that, the ALJ's credibility finding should be affirmed. How much deference? As pointed out in Ballantyne, there is a significant deference that this court is supposed to affirm, unless there's clear legal error and the ALJ decision is not supported by substantial evidence. And in this case, I would maintain that that is not the case. If the Court has no further questions, thank you for your time, and I do request that this Court affirm the Commissioner. Thank you very much. We have a few moments for rebuttal. First of all, I'd just like to mention Dr. Alvord, and note this in my briefs, reviewed no evidence other than Dr. Essink's report, even though the HALAC says that they were supposed to have provided him with all of the evidence so he could base his opinion on everything, not just on his one interview. You were going to check some authority for me. I was. The problem we run into is that Social Security does not specifically state, and nor could it tell a judge exactly what he must state in his decision. The key issue is that he must evaluate all the evidence, and the only way this Court or any appellate body can know what it is he's based his decision on is if he explains what he's considered. So in other words, you're saying there's no case law, there's no regulation that says that, but in your view, that in order to fulfill his or her responsibilities so we can review it properly, they have to do that. Well, I cite the case law of Flores, the line where Flores, where he cannot reject without explanation significant probative evidence. The question for you is what is significant, what is probative. My argument here is that there's just no way you can conclude that all of the treatment notes from his mental health therapist, none of those are significant and probative. He doesn't have to mention any of them. And the same is true that he didn't have to mention any of the clinical findings from a treating physician who treated him for three years. So that's how I would address that. Okay. We thank you very much. You're over time now, but we appreciate your argument and also that of the Commissioner. The case just argued is submitted. Thank you, Your Honor. Thank you very much.
judges: Walter, Smith, Smith